# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ELIZABETH CHAPMAN,**

**Plaintiff,**

**-vs-** **Case No. 6:06-cv-754-Orl-UAM**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

---

## MEMORANDUM OF DECISION

Plaintiff Elizabeth Chapman [“Chapman”] appeals to the district court from a final decision of the Commissioner of Social Security [the “Commissioner”] denying Chapman’s application for a period of disability and disability insurance benefits. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner’s decision is **REVERSED AND REMANDED**.

## I. PROCEDURAL HISTORY

On July 2, 2001, Chapman filed a claim for disability insurance benefits, claiming disability as of November 17, 2000. R. 53. On August 2, 2005, the Honorable Henry U. Snavely, Administrative Law Judge [“ALJ”], held a hearing on Chapman’s claim in Melbourne, Florida. R. 371 - 401. Attorney Bradley Boyd represented Chapman at the hearing. R. 373. The ALJ heard testimony from Chapman only.

On January 4, 2006, the ALJ issued a decision that Chapman was not disabled and not entitled to benefits. R. 11-24. Following a review of the medical and other record evidence, the ALJ found

that Chapman could not perform her past relevant work as a registered nurse and supervisor. R. 21, 23 Finding 7. The ALJ found that Chapman nevertheless retained the residual functional capacity ["RFC"] to perform substantially all of the full range of unskilled light work. R. 23, Finding 11. Applying the Medical-Vocational Guidelines, the ALJ concluded that Chapman was not disabled. R. 23, Finding 12.

After considering additional medical records, the Appeals Council denied review on May 11, 2006. R. 7-10. On June 2, 2006, Chapman timely appealed the Appeals Council's decision to the United States District Court. Docket No. 1. On October 30, 2006, Chapman filed in this Court a memorandum of law in support of her appeal. Docket No. 15. On December 26, 2006, the Commissioner filed a memorandum in support of his decision that Chapman was not disabled. Docket No. 16. The appeal is ripe for determination.

## II. THE PARTIES' POSITIONS

Chapman assigns three errors to the Commissioner. First, Chapman claims that the Commissioner erred in failing to give controlling weight to the opinion of Chapman's treating psychiatrist, Dr. Vasudevan. Second, Chapman claims that the Commissioner erred by mechanically applying the Medical-Vocational Guidelines ("Grids") and failing to obtain vocational expert testimony in light of Chapman's nonexertional impairments. Third, Chapman claims that the Commissioner erred in failing to properly assess her credibility. The Commissioner argues that substantial evidence supports his decision to deny disability, and the decision should be affirmed.

## III. THE STANDARD OF REVIEW

### A. AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B. REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

**C. REMAND**

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon*

*v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

## V. APPLICATION AND ANALYSIS

### A. THE FACTS

Chapman was born on December 31, 1964, making her 42 years old on the date of the ALJ's decision. R. 11, 53. Chapman received a BSN from University of Florida in 1987. R. 90, 377. Chapman has past relevant work as a registered nurse and a nurse manager. R. 61.

In early 1999, the Chapman was treated for depression and anxiety by her primary care physician, Arthur Stember, M.D. R. 155-56. Dr. Stember prescribed Paxil and Wellbutrin. Dr. Stember also diagnosed obesity and GERD [gastroesophogeal reflux disease]. *Id*. On February 18, 1999, Chapman weighed 346 pounds. R. 156.

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

On April 1, 1999, Chapman was evaluated by psychiatrist Lia Nardone, M.D.  R. 171-173. Dr. Nardone diagnosed Major Depression, recurrent and severe, and Dysthymia[2] with early onset. R. 173.  Dr. Nardone assessed a GAF score of 55 to 60[3] and increased Chapman's dose of Paxil.  *Id.* On July 21, 1999, clinical psychologist Patricia J. Shiflett, Ph.D. administered the Beck Depression Inventory and also concluded that Chapman suffered from Major Depression.  R. 146.  Dr. Shiflett assessed excessive sleep patterns, minimal motivation and initiative and severe anhedonia.  *Id*. Dr. Shiflett referred Chapman back to Dr. Nardone for medication management.  *Id*.

On June 13, 2000, Chapman reported to Dr. Nardone that she was having financial difficulties and was worried that she may need to take another job.  R. 161.  She also complained of difficulties coping with work stressors and hypersomnia.  *Id*.  She had stopped taking her Paxil several weeks ago due to cost.  *Id*.  She denied binge eating, but admitted eating large quantities of food.  *Id*. Dr. Nardone assessed a moderately anxious mood, but that Chapman's thought processes were organized with no evidence of psychosis.  *Id*.  Dr. Nardone gave Chapman Paxil samples and ordered her to restart the Paxil.  *Id*.

On July 24, 2000, the Chapman reported feeling overwhelmed with her job responsibilities. R. 159.  Dr. Nardone assessed Chapman's speech as pressured and rapid.  Chapman appeared

---

[2] Dysthymic disorder (or dysthymia) is a depressive mood disorder. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) [hereinafter "DSM-IV"]. The diagnostic criteria for dysthymic disorder is a depressed mood for most of the day (for more days than not) for at least two years, with the presence of two or more of the following: poor appetite or overeating; insomnia or hypersomnia; low energy or fatigue; low self-esteem; poor concentration or difficulty making decisions; feelings of hopelessness. DSM-IV at 349. The DSM-IV diagnosis code provides no severity specifier for dysthymic disorder.

[3] The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV at 32. A GAF code of 51 - 60 indicates moderate symptoms, or moderate difficulty in social or occupational functioning

disheveled and her mood was anxious, although she denied significant depressed mood and her concentration was within normal limits. *Id*. Dr. Nardone worked with Chapman on relaxation techniques and improving her coping skills. *Id*. Her medications were continued. *Id*.

On September 26, 2000, Chapman reported increased depression prior to vacation, but that she had a nice trip and enjoyed a separate visit with her mother. R. 158. Chapman was feeling more secure in her job. *Id*. Dr. Nardone noted that Chapman had some histrionic tendencies, but that her mental status examination was within normal limits in all areas. *Id*.

On November 28, 2000, Chapman reported to Dr. Nardone that her job had been eliminated and that she was anxious about it. R. 157. Chapman also reported that she had stopped taking her Wellbutrin and Prozac several weeks ago. *Id*. Chapman denied insomnia or anhedonia and was hopeful. *Id.* Dr. Nardone noted that Chapman's appearance was disheveled and that her mood was anxious and dysthymic, but that she was coping well with her recent setbacks. *Id*. Dr. Nardone decided to monitor Chapman's mood while off medication. *Id*.

On May 16, 2001, James R. Oelschlager, Psy. D. performed a psychological evaluation of Chapman. R. 181-184. Dr. Oelschlager administered the Minnesota Multiphasic Personality Inventory (MMPI-II), a clinical interview, and reviewed Chapman's vocational rehabilitation records. R. 181. Dr. Oelschlager assessed Chapman's mood and affect to be moderately to severely depressed. R. 182. Chapman's attention and concentration were mildly to moderately impaired. *Id*. Her insight and judgement was fair. *Id*. Although Chapman was cooperative with the examiner, she was "emotionally very fragile." *Id*. The MMPI-II test revealed Chapman read the items carefully and answered consistently with a tendency to overendorse pathological items. *Id*. Nevertheless, the test

revealed severe depression, weakened reality ties, a great deal of interpersonal suspicion, obsessive and ruminative tendencies and an inability to feel comfortable when interacting with others. R. 182-83. At the time of the assessment, her coping skills were very limited. R. 183. Dr. Oelschlager diagnosed Major Depressive Disorder without psychotic features (296.33), Generalized Anxiety Disorder, NOS (300.02), and Personality Disorder NOS (301.9) with paranoid features. *Id.*

On September 18, 2001, Dr. Oelschlager continued his psychological evaluation of Chapman by administering the Weschler Adult Intelligence Scale-II. R. 178-180. Chapman's concentration and attention were unimpaired. R. 178. Her mood appeared to be mildly depressed and anxious. *Id.* Chapman's test score fell within the range of Average Range of Intellectual Functioning. R. 179. It was noted that Chapman still had not initiated medication intervention. *Id.* Diagnostically, Dr. Oelschlager's previous evaluation diagnoses remained unchanged. R. 180.

On May 18, 2001, Chapman was referred by Vocational Rehabilitation to orthopaedist Homi Cooper, M.D. for evaluation of her low back, knees and ankles. R. 187-190. Chapman reported low back pain, pain in her thighs and down into her knees, some tingling in her feet, pain in her ankles and a history of giving away of the right knee on occasion. R. 187. On examination, Chapman's height and weight were 5'10" and 350 pounds respectively. R. 188. The lumbrosacral spine showed interspace narrowing at L4-5 and L5-S1, with no spondylosis or spondylolisthesis. *Id.* Chapman displayed bilateral medial ligament laxity of the knees, which was probably congenital and normal for her. R 189. Dr. Cooper's impression was degenerative vertebral spine and disc disease and bilateral knee pain with questionable cause. *Id.* Chapman's ankles were normal. *Id.* Dr. Cooper recommended that Chapman avoid repeated bending and squatting motions, avoid climbing to

unprotected heights because of her height/weight disproportion, and lifting of 15 to 20 pounds on a repeated basis.  R. 190.

Objective testing ordered by Dr. Cooper included right and left knee MRI's dated June 13, 2001, showing mild chondromalacia of the patellas.  R. 194-95.  An MRI of the lumbar spine on the same date revealed disc space narrowing and posterior disc protrusion at L3-4 and L4-5 of doubtful significance with a probable large L2 hemangioma.  R. 193.

On September 4, 2001, Chapman sought treatment from Donna Miller-Brown, Psy. D. of Brevard Outpatient Alternative Treatment Center.  R. 223-228.  Chapman complained about losing her job, having to move in with her mother due to financial difficulties and being depressed about her situation.  R. 223.  Chapman did not want to go back to nursing, but was not sure what to go into.  R. 227. Dr. Miller-Brown assessed Chapman as intelligent, insightful and skilled as a nurse.  *Id*.  Chapman demonstrated "slowed expressive speech and thought process." *Id*.  Chapman's mood was depressed and her affect was sad.  *Id*.  Dr. Miller-Brown diagnosed Dysthymia and assessed a GAF score of 60.  *Id*.

On October 2, 2001, Chapman continued reporting to Dr. Miller-Brown that she experienced symptoms of depression including excessive sleeping, anhedonia, feelings of worthlessness, expressing no meaning to life, fatigue and lack of energy.  R. 220.   Chapman's family doctor, however, was hesitant to prescribe medication for her.  *Id*.

On November 6, 2001, Chapman reported her depression as a "5" on a 1-10 scale.  R. 215.  Chapman reported feeling slow and difficulties concentrating, even to balance her checkbook or to use a calculator.  R. 215.

Chapman was treated by psychiatrist Vinet Mehta, M.D. from November 5, 2001 to September 29, 2003. R. 326-329. During this time period, Chapman saw Dr. Mehta twelve times. On October 2, 2003, Dr. Mehta stated in a letter to the Office of Disability Determination that Chapman suffers from chronic recurrent depression, which is very severe at times. R. 248. She had completed vocational rehabilitation and was searching for a job without success. *Id*. In the meantime, she continued to feel very stressed and is not happy. *Id*. She was being maintained on 150 mg Wellbutrin a day. *Id*. Her diagnosis was Major Depression, recurrent, in partial remission. *Id*.

On October 21, 2003, Chapman sought treatment from psychiatrist Librada Porciuncula, M.D. of Circles of Care, Inc. R. 244-246. She complained that Dr. Mehta never gave her enough time and did not listen to her. R. 244. She also thought the Wellbutrin was ineffective. *Id*. Dr. Porciuncula stated Chapman was intelligent, employable and motivated. R. 245. Because of Chapman's tendency to go into detail about everything, the doctor needed to redirect her at times. *Id.* Chapman's mood was labile with some underlying anger and hostility. *Id*. She was cooperative and a good source of information. *Id*. There was no evidence of psychotic symptoms, but Chapman seemed paranoid and untrusting of others. *Id*. Dr. Porciuncula diagnosed Dysthymic disorder, Social Anxiety Disorder and Mixed Personality traits, borderline and paranoid. R. 246. Her GAF was 60. *Id*. Dr. Porciuncula prescribed Paxil and Topamax. *Id.*

On October 29, 2003, Dr. Michael Zelenka, a state agency psychologist, reviewed the medical evidence and concluded that Chapman had a severe impairment due to major depression, in partial remission. R. 249-68. Dr. Zelenka noted that Plaintiff had been in treatment and had been enrolled in school, and that she worked 12 hours per week while undergoing vocational rehabilitation. R. 253.

He concluded that given some allowances for occasional psychological problems affecting productivity, Chapman had the mental ability to carry out instructions appropriately and relate adequately to others in a routine work setting. *Id*. Chapman only had mild to moderate limitations in maintaining concentration, persistence or pace. R. 264.

On November 17, 2003, Chapman continued treatment through Circles of Care with psychiatrist S. Vasudevan, M.D. R. 301. Dr. Vasudevan assessed "some tangential and rambling expressions," but she was cognitively intact. *Id*. Dr. Vasudevan continued Chapman on Paxil and Topamax, even though Chapman said she was not sure whether it was helping her. *Id*.

On December 11, 2003, Chapman told Dr. Vasudevan that she was hearing voices. R. 300. Dr. Vasudevan assessed the Chapman's affect as flat with a mildly depressed mood. *Id*. Dr. Vasudevan assessed that the Chapman was hallucinating and prescribed a new medication, Seroquel along with her other medications. *Id*. Dr. Vasudevan diagnosed Major Depressive Disorder with psychosis and rule out Schizoaffective Disorder. *Id*.

On January 8, 2004, Chapman reported hearing bells ringing and other various noises, but no voices. R. 299. Chapman denied feeling depressed and she was in group therapy. *Id*. Dr. Vasudevan increased the Chapman's dose of Seroquel. *Id*. On January 20, 2004, Chapman reported more auditory hallucinations and was seeing vivid things moving in front of her. R. 298. Dr. Vasudevan assessed that the Chapman was more psychotic and less depressed and again increased the Seroquel dose. *Id*. On January 30, 2004, Dr. Vasudevan noted the Chapman's continued auditory hallucinations, although she was not being disturbed as much by them as in the past, and less paranoid thoughts. R. 297. Chapman's medications were continued. *Id*.

On February 18, 2004, Dr. Kevin Ragsdale, another state agency psychologist, reviewed the updated medical evidence and concluded that Chapman had a severe impairment due to major depression, in partial remission. R. 269-88. Dr. Ragsdale concluded that Chapman would be moderately impaired in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workweek without interruptions from psychologically based symptoms; and get along with coworkers or peers. R. 269-70. Dr. Ragsdale indicated that Chapman would not be significantly limited in the other listed areas. *Id*. Dr. Ragsdale opined that Chapman retained most of the essential mental and social abilities needed to sustain performance of unskilled work tasks, and would be best suited to a solitary employment situation. R. 271.

On March 25, 2004, Chapman reported that she was still hallucinating and occasionally still heard voices. R. 296. Chapman also reported "feeling somewhat tired and weak and depressed." *Id*. On April 22, 2004, Chapman reported hearing more voices. R. 294. Dr. Vasudevan opined that Chapman was experiencing more paranoid thoughts and more auditory hallucinations, but her depression was getting better. *Id*. Dr. Vasudevan prescribed Risperdal for the hallucinations. Id.

Over the next few months the Chapman showed signs of improvement with medication. R. 290-293. On October 12, 2004, however, Chapman again reported hearing voices. R. 289. She reported feeling depressed at times, feeling down and having no energy. *Id*. Dr. Vasudevan opined that Chapman was showing signs of decompensation in the form of hallucinations and noted that she was psychotic. *Id*. Dr. Vasudevan continued Wellbutrin, increased the dose of Trazodone and Risperdal and added a prescription of Effexor. *Id.*

On June 21, 2005, therapist Tarsa Soloman, LMHC completed a Mental Ability to Do Work-Related Activities form describing the Chapman's abilities. R. 302-303. Ms. Soloman opined that the Chapman has no useful ability, or "poor" ability, to function in the following areas: relate to co-workers, deal with the public, interact with supervisors, deal with work stressors and maintain concentration or attention. R. 302. Chapman also has no useful ability to understand, remember and carry out complex job instructions, to relate predictably in social situations and to demonstrate reliability. R. 303.

On July 26, 2005, Dr. Vasudevan completed a Psychiatric Review Technique ("PRT") form detailing Chapman's mental limitations for the period of October 2003 to June 2005. R. 332-345. Dr. Vasudevan opined that Chapman's impairments resulted in the following functional limitations: no restriction in activities of daily living; marked restriction in maintaining social functioning; marked restrictions in maintaining concentration, persistence or pace; and one or two episodes of decompensation of extended duration. R. 342. Dr. Vasudevan concluded that Chapman was depressed, psychotic and unable to function in any gainful employment. 344.

## B. THE ANALYSIS

### 1. <u>The ALJ's Failure to Give Controlling Weight to Dr. Vasudevan's Opinion</u>

The ALJ gave little weight to the opinion of Chapman's treating physician, Dr. Vasudevan, who opined that Chapman was unable to function in any gainful employment. R. 20, 344. While acknowledging that the opinions of treating physicians normally are accorded great weight, the ALJ determined that Dr. Vasudevan's opinion was unsupported by objective medical evidence and Chapman's activities of daily living. R. 20. Chapman argues that Dr. Vasudevan's opinion was

supported by objective medical evidence and that her ability to engage in activities of daily living does not mean that she is able to work.

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards v. Sullivan*, 937 F.2d 580 (11th Cir. 1991) (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See, Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

A review of the ALJ's decision reflects that he considered all of the medical findings and evidence of Chapman's condition. The ALJ described in detail the medical evidence contrary to

Dr. Vasudevan's opinion, including Dr. Vasudevan's own treatment notes. The ALJ further detailed how Chapman's activities of daily living were inconsistent with a finding that she was markedly limited in social functioning and maintaining concentration, persistence or pace. R. 20. There was substantial evidence in the record to support the ALJ's rejection of Dr. Vasudevan's opinion. As such, there is no basis for the Court to disturb the ALJ's findings.

**2. Application of the Grids Without Expert Testimony**

Chapman contends that she had nonexertional impairments of anxiety, major depression, personality disorder and schizophrenia. Docket 15 at 12. Chapman argues that due to her nonexertional impairments, the ALJ's exclusive reliance on the grids was error.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations

are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

In this case, the ALJ found that Chapman had the residual functional capacity to perform substantially all of the full range of unskilled light work. R. 23, Finding 11. The ALJ also found that Chapman's capacity for unskilled light work "is substantially intact and has not been compromised by any nonexertional limitations." R. 23, Finding 13. Given these findings, the ALJ appropriately could rely on the grids to determine that Chapman was not disabled. The ALJ did not err.

**3. Chapman's Credibility**

In his findings, the ALJ states that Chapman's "allegations regarding her limitations are not totally credible for the reasons set forth in the body of this decision." R. 22, Finding 5. Chapman argues that there was no discussion in the body of the decision regarding her lack of credibility and, therefore, the ALJ erred. The Commissioner failed to respond to this argument.

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,*

67 F.3d at 1561-62*; Jones v. Dep't of Health & Human Serv.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

The Court finds that the record is not obvious as to the credibility finding. Chapman asserts both physical and nonexertional impairments. The Court cannot even determine what testimony about which impairment that the ALJ rejected as not credible. Because Chapman's testimony regarding her nonexertional impairments could be critical to the outcome of the case, the case must be remanded pursuant to Sentence Four for the ALJ to further explain his credibility finding.

VI. CONCLUSION

For the reasons stated above, the decision of the Commissioner is **REVERSED AND REMANDED**. The Clerk is directed to enter a separate judgment in Plaintiff's favor and to close the case.

**DONE AND ORDERED** this 9th day of August, 2007.

Donald P. Dietrich
DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Reginald V. Speegle, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia 30303-8920

The Honorable Henry U. Snavely
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL 32817